# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

HELEN C.,[1]

      Plaintiff,

vs.

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

             :    Case No. 2:25-cv-00166
             :
             :    Magistrate Judge Caroline H. Gentry
             :    (by full consent of the parties)

---

## DECISION AND ORDER

Plaintiff filed an application for Disability Insurance Benefits in August 2022. Plaintiff's claim was denied initially and upon reconsideration. After a hearing at Plaintiff's request, the Administrative Law Judge (ALJ) concluded that Plaintiff was not eligible for benefits because she was not under a "disability" as defined in the Social Security Act. The Appeals Council denied Plaintiff's request for review. Plaintiff subsequently filed this action.

Plaintiff seeks an order remanding this matter to the Commissioner for the award of benefits or, in the alternative, for further proceedings. The Commissioner asks the Court to affirm the non-disability decision. For the reasons set forth below, this Court REVERSES the Commissioner's decision and REMANDS for further proceedings.

---

[1] *See* S.D. Ohio General Order 22-01 ("The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that due to significant privacy concerns in social security cases federal courts should refer to claimants only by their first names and last initials.").

## I.     BACKGROUND

Plaintiff asserts that she has been under a disability since March 10, 2022. At that time, she was fifty-two years old and was considered a "person closely approaching advanced age." 20 C.F.R. § 404.1563(d). Plaintiff has a "high school education and above." 20 C.F.R. § 404.1564(b)(4).

The evidence in the Administrative Record ("AR," Doc. No. 6) is summarized in the ALJ's decision ("Decision," Doc. No. 6-2 at PageID 36-54), Plaintiff's Statement of Errors ("SE," Doc. No. 8), the Commissioner's Memorandum in Opposition ("Mem. In Opp.," Doc. No. 10), and Plaintiff's Reply Memorandum ("Reply," Doc. No. 11). Rather than repeat these summaries, the Court will discuss the pertinent evidence in its analysis below.

## II.    STANDARD OF REVIEW

The Social Security Administration provides Disability Insurance Benefits to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 402, 423(a)(1), 1382(a). The term "disability" means "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).

This Court's review of an ALJ's unfavorable decision is limited to two inquiries: "[W]hether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d

399, 406 (6th Cir. 2009); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."). "Unless the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence," this Court must affirm the ALJ's decision. *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 849 (6th Cir. 2020). Thus, the Court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Id*.

"Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citation omitted). This limited standard of review does not permit the Court to weigh the evidence and decide whether the preponderance of the evidence supports a different conclusion. Instead, the Court is confined to determining whether the ALJ's decision is supported by substantial evidence, which "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citation omitted). This standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986). Thus, the Court may be required to affirm the ALJ's decision even if substantial evidence in the record supports the opposite conclusion. *Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997).

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence

3

supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009). "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Id.* (citations omitted). Such an error of law will require reversal even if "the outcome on remand is unlikely to be different." *Cardew v. Comm'r of Soc. Sec.*, 896 F.3d 742, 746 (6th Cir. 2018) (internal quotations and citations omitted).

## III.  FACTS

### A.  The ALJ's Factual Findings

The ALJ was tasked with evaluating the evidence related to Plaintiff's application for benefits. In doing so, the ALJ considered each of the five sequential steps set forth in the Social Security regulations. *See* 20 C.F.R. § 404.1520. The ALJ made the following findings of fact:

Step 1:   Plaintiff has not engaged in substantial gainful activity since March 10, 2022, the alleged onset date.

Step 2:   She has the severe impairments of osteoarthritis, degenerative disc disease of the lumbar spine, gastritis, irritable bowel syndrome, gastroesophageal reflux disease, type II diabetes mellitus, tendinosis/tendinitis, and insomnia.

She has the nonsevere impairments of hyperlipidemia, hypertension, squamous cell carcinoma, and residuals of a remote left knee surgery.

Her alleged impairments of dementia and Alzheimer's disease are not medically determinable impairments because they are not validated by objective evidence.

4

Step 3: She does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4: Her residual functional capacity (RFC), or the most she can do despite her impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of light work as defined in 20 C.F.R. § 404.1567(b), subject to the following limitations: "[Plaintiff] can never climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs; can occasionally stoop, kneel, crouch, and crawl; and can frequently balance as that term is defined in the Dictionary of Occupational Titles (DOT)."

She is able to perform past relevant work as a contract bid administrator, a procurement manager, and composite work consisting of elements of a contract manager and supervisor.

Step 5: In addition to her past relevant work, considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that she can perform.

(Decision, Doc. No. 6-2 at PageID 41-49.) These findings led the ALJ to conclude that Plaintiff does not meet the definition of disability. (*Id.* at PageID 49.)

## B.      Plaintiff's Cognitive Complaints

### 1.      Plaintiff's self-reported symptoms

Plaintiff complained of memory loss, anxiety, depression, and difficulty with understanding, remembering, concentrating, paying attention, following written and spoken instructions, and handling changes in routine. (AR, Doc. No. 6-6 at PageID 208-09.) She found it difficult to remember "what [she] did day to day at times" and to remember people she did not see often. (*Id.* at PageID 202.) She did not need reminders to care for her personal needs but did need to set alarms to remind her to take medications. (*Id.* at PageID 205.)

During the November 2023 hearing, Plaintiff testified that she had been diagnosed with the onset of Alzheimer's and dementia and that her memory issues had worsened in the past six months. (AR, Doc. No. 6-2 at PageID 69.) She experienced difficulty with recall and recognizing people. (*Id.*) She could focus for approximately twenty minutes when reading. (*Id.* at PageID 70-71.) She still needed to set alarms to remind herself to take her medications. (*Id.*)

### 2. Objective medical evidence

Plaintiff underwent a neurological evaluation in August 2021. (AR, Doc. No. 6-7 at PageID 392-97.) She reported a family history of Alzheimer's dementia and a one-year history of progressive memory loss. (*Id.* at PageID 393.) She experienced daily memory loss for short- and long-term events. (*Id.*) Plaintiff reported being "increasingly forgetful," repeating herself in conversations, and having difficulty with word-finding and following conversations. (*Id.*) Sumaiya Salim, M.D. noted that Plaintiff's scores on the Montreal Cognitive Assessment (MOCA) were "quite good" but noted that Plaintiff "disproportionately missed recall," which was "consistent with [Plaintiff's] complaints of primarily memory loss." (*Id.* at PageID 392.) Dr. Salim recommended that Plaintiff undergo a neuropsychological examination, brain MRI, and laboratory testing. (*Id.*)

A September 2021 MRI of the brain was normal (AR, Doc. No. 6-7 at PageID 399.) During a neuropsychological evaluation in February 2022, Plaintiff stated that her memory difficulties with recent and remote events had "gradually worsened" over the past year. (AR, Doc. No. 6-7 at PageID 343.) Plaintiff also reported difficulty with forgetting conversations, repeating herself, word-finding, maintaining attention, and

6

losing her train of thought. (*Id.* at PageID 344.) Plaintiff stated that she was independent in her basic activities of daily living but benefitted from following a routine and "sometimes forg[ot] whether she completed a task" if she deviated from her routine. (*Id.*) Plaintiff also used calendars and reminders to manage appointments and medications. She occasionally forgot to pay bills. (*Id.*)

Dr. Salim reported that the neuropsychological testing showed a "broadly average cognitive profile" with "some evidence of variable task engagement." (AR, Doc. No. 6-7 at PageID 343, 346.) Dr. Salim noted that the testing showed below average functioning in the domains of fund of knowledge and semantic fluency, and exceptionally low scores in constructional drawing. (*Id.* at PageID 343, 345.) The testing also indicated mild depression and elevated anxiety. (*Id.* at PageID 343, 346.) Dr. Salim concluded that Plaintiff did "not meet criteria for a neurocognitive disorder" and found "no evidence to suggest that [Plaintiff was] experiencing the early stages of a neurodegenerative process." (*Id.* at PageID 343.) Dr. Salim further stated: "Rather, the etiology of her mild cognitive inefficiencies is likely multifactorial. Potential contributing factors include worry and recent stressors, chronic pain, and poor sleep, although she stated that her sleep has improved with medication." (*Id.* at PageID 343.)

### C. Osteoarthritis, Degenerative Disc Disease, and Tendinosis/Tendinitis

#### 1. Plaintiff's self-reported symptoms

Plaintiff stated that the combination of her physical conditions caused difficulty with lifting, walking, sitting, standing, squatting, bending, kneeling, and climbing stairs. (AR, Doc. No. 6-6 at PageID 208.) She reported that she needed to change positions

often and had difficulty sleeping at night because of the discomfort caused by these conditions. (*Id.* at PageID 204, 207.) She could prepare simple meals and do light housework, although her husband did the cooking and helped with activities such as carrying loads of laundry. (*Id.* at PageID 205.)

During the November 2023 hearing, Plaintiff testified that she experienced pain in her hip and lower back when sitting, standing and lying down, and also had numbness and tingling in her legs and back. (AR, Doc. No. 6-6 at PageID 67-68, 72-73.) She also testified that she took Gabapentin and Morphine to manage the pain, as Oxycodone had not alleviated it. (*Id*. at PageID 69.)

### 2. Objective medical evidence

Orthopedic records show that Plaintiff received treatment and took medication for knee pain at least as early as January 2021. (AR, Doc. No. 6-7 at PageID 356.) In December 2021, she continued to complain of chronic pain and difficulty climbing stairs, although she reported that her use of a cream and patches decreased the severity of her symptoms. (*Id.* at PageID 370.) A physical examination showed no effusion and full range of motion, although Joseph Ruane, D.O. also documented inferior peripatellar pain and minimal crepitus. (AR, Doc. 6-7 at PageID 370.)

March 2022 right hip x-rays showed a "calcific structure suspicious for an intra-articular body" but were otherwise normal and showed no femoroacetabular osteoarthritis. (AR, Doc. No. 6-7 at PageID 378.) During an orthopedic follow-up visit in March 2022, Plaintiff complained that her knee and right hip pain had increased over the past two months. (*Id.* at PageID 374.) She also complained of some weakness, numbness,

and paresthesias in the right leg. (*Id.*) Dr. Ruane reported that the physical examination showed "some pain at end range" upon right hip range of motion testing, modest tenderness of the lateral soft tissues, increased pain with seated bench testing, altered sensation of the leg, positive Trendelenburg testing of the right hip, and decreased (4/5) abduction. (*Id.*) Dr. Ruane increased Plaintiff's gabapentin dosage and recommended EMG testing. (*Id.* at PageID 375.) EMG testing and a nerve conduction study in April 2022 were normal. (*Id.* at PageID 405.) Plaintiff began physical therapy for her pain complaints later in April 2022. (*Id.* at PageID 606.)

In June 2022, Plaintiff told Dr. Ruane that she continued to experience left knee pain, as well as right hip pain and discomfort. (AR, Doc. No. 6-7 at PageID 382.) According to Dr. Ruane, Plaintiff's gait was "not noticeably antalgic," but he otherwise documented "strongly positive" Trendelenburg signs, diffuse and nonspecific discomfort to palpation, hip flexor pain and weakness, and diffuse pain and crepitus of the left knee. (*Id.*) A right hip MRI taken later that month showed tendinosis and partial tearing of the right gluteus minimus insertion on the greater trochanter, tendinosis and partial tearing of the right hamstring origin, and a tear of the right anterior superior labrum. (AR, Doc. No. 6-8 at PageID 775.) After reviewing the MRI report, Dr. Ruane performed a right hip diagnostic ultrasound and injection in July 2022. (AR, Doc. No. 6-7 at PageID 381, 434.)

At an orthopedic follow-up visit in August 2022, Plaintiff reported that she received no relief from the diagnostic injection. (AR, Doc. No. 6-7 at PageID 436.) Dr. Ruane again documented examination abnormalities that included right hip tenderness, positive Trendelenburg testing, and decreased (4/5) strength during right hip abduction.

9

(*Id.*) Dr. Ruane reported that the June 2022 right hip ultrasound showed gluteus minimus tendinopathy with a low-grade partial-thickness tear of the gluteus minimus, as well as severe gluteus medius tendinopathy with a low-grade partial-thickness tear of the gluteus medius. (*Id.* at PageID 437.) Dr. Ruane thereafter administered a right ischial tuberosity and hamstring injection. (*Id.* at PageID 438.)

Plaintiff nevertheless continued to complain of pain at the next orthopedic visit in September 2022. (*Id.* at PageID 440.) Dr. Ruane again documented several abnormal examination findings, including limited range of motion, a short stride length, and difficulty with toe and heel walking, although Plaintiff's tandem gait was intact. (*Id.*) Dr. Ruane also noted that lumbar spine x-rays showed mild to moderate multilevel degenerative changes, including disc degeneration and facet arthropathy, that were most notable at the L4-5 and L5-S1 levels. (*Id.* at PageID 441.) Dr. Ruane noted: "[Plaintiff] presents with right L5 radiculopathy secondary to disc degeneration and facet arthropathy likely contributing to foraminal stenosis. I do think that she has some element of opioid-induced hyperalgesia as well." (*Id.*) Later that month, Plaintiff told Dr. Ruane that the injections and physical therapy were of "no help." (AR, Doc. No. 6-8 at PageID 803.) In October 2022, Plaintiff told Dr. Ruane that her hip pain remained "intense." (AR, Doc. No. 6-7 at PageID 595.) Dr. Ruane noted that although Plaintiff rated her pain at a level of nine out of ten (with ten being the highest pain), she "fortunately appear[ed] to be rather comfortable." (*Id.*) Dr. Ruane further noted that Plaintiff may have developed a tolerance to her pain medication, and so he recommended pain management treatment. (*Id.* at PageID 596.)

Plaintiff began treatment with pain management physician Andrew McNicol, M.D. in November 2022. (AR, Doc. No. 6-7 at PageID 726.) She complained of left knee, right hip, and low back pain. (*Id.*) The physical examination showed mild joint effusion, tenderness to palpation, and crepitus of the left knee. (*Id.* at PageID 728.) A lumbar spine MRI in December 2022 showed multilevel discogenic changes, facet arthropathy, and broad-based disc protrusions at the L2-3 and L4-5 levels. (*Id.* at PageID 708.) Dr. McNicol administered a left leg genicular nerve block in December 2022. (*Id.* at PageID 730.) At a follow-up visit in January 2023, Plaintiff reported "moderate relief" from the injection, but she nevertheless rated her pain at a level of nine out of ten. (*Id.* at PageID 735.) Dr. McNicol prescribed Valium. (*Id.* at PageID 736.) Orthopedist Dr. Ruane prescribed Morphine in February 2023. (*Id.* at PageID 721.) Later that month, Dr. McNicol performed a left-sided genicular radiofrequency ablation procedure. (*Id.* at PageID 740-742.)

### D.      Gastritis and Gastroesophageal Reflux Disease (GERD)

#### 1.      Plaintiff's self-reported symptoms

Plaintiff stated that the combination of her physical conditions caused difficulty with lifting, walking, sitting, standing, squatting, bending, kneeling, and climbing stairs. (AR, Doc. No. 6-6 at PageID 208.) She reported that she needed to change positions often and had difficulty sleeping at night because of the discomfort caused by these conditions. (*Id.* at PageID 204, 207.) She could prepare simple meals and do light housework, although her husband did the cooking and helped with activities such as carrying loads of laundry. (*Id.* at PageID 205.) During the November 2023 hearing,

Plaintiff testified that she experienced nausea and vomiting because of her ulcer when she ate "anything that [she] shouldn't" or was anxious. (*Id*. at PageID 70-71.)

### 2. Objective medical evidence

Primary care records show that Plaintiff's physician prescribed Pantoprazole for chronic gastritis in November 2021. (AR, Doc. No. 6-7 at PageID 311.)  Plaintiff was hospitalized for complaints of upper abdominal pain and nausea in July 2022. (*Id.* at PageID 451, 665.) A CT scan of the abdomen and pelvis was suggestive of an enhancing mass involving the wall of the stomach. (*Id.* at PageID 451.) An upper gastrointestinal endoscopy (EGD) showed gastritis with grade 3 reflux esophagitis, albeit with no bleeding, as well as a hiatal hernia. (*Id.*) At a follow-up gastroenterology visit in August 2022, Paul Bonner, D.O. reported that the July 2022 endoscopy showed a "giant gastric ulcer" that extended across the pylorus and into the duodenum. (*Id.* at PageID 544.) A repeat EGD in August 2022 showed significant healing of the ulcer but "a large linear scar extending across the pylorus caus[ed] a gastric outlet obstruction." (*Id.*) A physical examination showed moderate tenderness in the epigastric region. (*Id.* at PageID 546.)

An endoscopy in September 2022 showed a "nearly completely obstructing non-bleeding linear gastric ulcer of moderate severity" at the pylorus. (AR, Doc. No. 6-7 at PageID 563.) Plaintiff was hospitalized later that month for a diagnosis of "gastric outlet obstruction secondary to a giant prepyloric gastric ulcer," and Dr. Bonner performed a laparoscopic truncal vagotomy with gastrojejunostomy. (*Id.* at PageID 446, 571.) After a post-operative visit in October 2022, Dr. Bonner reported that upper gastrointestinal imaging was negative for any complications or leaking. (*Id.* at PageID 585.) Plaintiff said

she was tolerating a diet without difficulty and her bowels were functioning normally. (*Id.*) However Dr. Bonner advised Plaintiff that she was at a high risk for experiencing delayed gastric emptying from the vagotomy procedure. (*Id.*)

### E.  Insomnia

#### 1.  Plaintiff's self-reported symptoms

Plaintiff stated that she had difficulty sleeping at night because of the discomfort caused by her physical conditions. (AR, Doc. No. 6-6 at PageID 208.) During the November 2023 hearing, Plaintiff testified that she had difficulty sleeping if she was anxious and that she slept only five to six hours per night. (*Id*. at PageID 73.)

#### 2.  Objective medical evidence

Primary care records show that Jennifer Briones, M.D. was prescribing Ambien and Trazodone for primary insomnia in November 2021. (AR, Doc. No. 6-8 at PageID 836.) Dr. Briones was still prescribing those medications in November 2022, and she noted: "Chronic[,] stable condition on current therapy." (AR, Doc. No. 6-8 at PageID 846.) Dr. Briones made identical notations in subsequent progress notes that were dated in February and August 2023. (*Id.* at PageID 857, 865.)

### F.  The ALJ's Decision

#### 1.  Plaintiff's cognitive complaints

Addressing Plaintiff's claimed impairments of dementia and Alzheimer's disease, the ALJ noted that the January 2022 neuropsychological evaluation had "broadly normal findings, no evidence to support early stages of neurodegenerative process, and mild cognitive inefficiencies *likely associated with stressors, <u>chronic pain</u>, and <u>poor sleep</u>*."

13

(Decision, Doc. No. 6-2 at PageID 42 (emphasis added).) Nevertheless, the ALJ found that "the evidence of record ***does not identify any etiology*** for [Plaintiff's] subjective reports of memory loss or confirmation of either alleged impairment." (*Id*. (emphasis added).) The ALJ reasoned that "in the absence of laboratory or clinical findings or medical observations validating the existence of a medically determinable impairment that could reasonably be expected to produce [Plaintiff's] alleged memory loss, an impairment in this regard cannot be medically determined." (*Id.*) Thus, because the record contained "no objective evidence to validate the existence of a medically determinable impairment related to [Plaintiff's] memory," the ALJ summarily concluded her analysis of Plaintiff's cognitive complaints:

> Social Security Ruling 16-3p states, "[a]n individual's symptoms . . . will not be found to affect the ability to perform work-related activities for an adult … unless medical signs or laboratory findings show medically determinable impairment is present … We must have objective medical evidence from an acceptable medical source to establish the existence of a medically determinable impairment that could reasonably be expected to produce an individual's alleged symptoms" (See 20 CFR 404.1521).

(*Id.*)

### 2.      Plaintiff's physical impairments

The ALJ concluded that although Plaintiff's medically determinable impairments could reasonably be expected to cause her symptoms, the "intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record …." (Decision, Doc. No. 6-2 at PageID 46.)

14

With respect to the medically determinable impairments of osteoarthritis, degenerative disc disease, and tendinosis/ tendinitis, the ALJ explained her analysis of Plaintiff's symptoms as follows:

> Principally, the record reflects complaints of musculoskeletal pain in the context of degenerative disc disease of the lumbar spine, osteoarthritis in the knees with a remote history of surgical intervention on the left, and tendinosis/tendinitis. [Plaintiff's] interventions for these impairments included a period of physical therapy and high dosages of opioids, which one treatment provider described as unsafe and for which [Plaintiff] seemed disinclined to engage in weaning despite medical advice. Despite both subjective reports during testimony and notations in the record of 10/10 pain, physical examinations throughout the period at issue were largely unremarkable, with only moderate findings as reflected above. At no time did [Plaintiff] require an assistive device for ambulation despite [Plaintiff's] pain and indeed remained able to drive, seek out treatment, and meaningfully participate in her own care.

(Decision, Doc. No. 6-2 at PageID 46.)

With respect to Plaintiff's gastritis and gastroesophageal reflux disease, the ALJ noted that she "was treated both with chronic medications as well as a gastrointestinal surgical intervention." (Decision, Doc. No. 6-2 at PageID 46.) The ALJ found that although Plaintiff was "provided an unspecified lifting limitation after gastrointestinal surgery," there was "no indication that this limitation was permanent." (*Id*.) The ALJ did not address Plaintiff's complaints about nausea and vomiting related to her ulcer. (*Id.*)

With respect to Plaintiff's insomnia, the ALJ stated only that "treatment was conservative and complaints sporadic during the period at issue." (Decision, Doc. No. 6-2 at PageID 46.)

15

The ALJ concluded her evaluation of Plaintiff's symptoms by explaining that "having considered [Plaintiff's] subjective reports as well as the totality of the record as a whole, the undersigned finds [Plaintiff] capable of light work" with the restrictions of never climbing ladders, ropes, or scaffolds; occasionally climbing ramps and stairs; occasionally stooping, kneeling, crouching, and crawling; and frequently balancing. (Decision, Doc. No. 6-2 at PageID 46.) The ALJ summarily concluded that the RFC adequately accounted for Plaintiff's alleged symptoms:

> In summary, the location, duration, frequency, and intensity of [Plaintiff's] alleged symptoms, as well as precipitating and aggravating factors, are adequately addressed and accommodated in the above residual functional capacity. The objective evidence fails to document the presence of any impairment or combination of impairments that could reasonably be expected to result in pain or other symptoms of such a severity or frequency as to preclude the range of work described above.

(*Id.* at PageID 47.)

## IV.    LAW AND ANALYSIS

### A.    Plaintiff's Assignments Of Error

Plaintiff asserts that the ALJ's RFC is unsupported by substantial evidence for two reasons: 1) the ALJ "improperly evaluated Plaintiff's subjective complaints pursuant to SSR 16-3p and mischaracterized the record while ignoring a probative line of evidence that was consistent with Plaintiff's subjective complaints;" and 2) the ALJ "failed to account for each severe impairment and to consider the combination of Plaintiff's impairments, both severe and non-severe, when formulating the RFC …." (SE, Doc. No. 8 at PageID 891.) Finding error in the ALJ's analysis of Plaintiff's symptoms, the Court

16

does not address Plaintiff's other alleged error and instead instructs the ALJ to address both of them on remand.

>  **B.      The ALJ Did Not Comply with SSR 16-3p When She Evaluated Plaintiff's Symptoms.**

>  **1.      Applicable legal framework**

The ALJ's evaluation of Plaintiff's symptoms was governed by a detailed Social Security regulation (20 C.F.R. § 404.1529) and SSR 16-3p, which mandates a two-step process for evaluating an individual's symptoms. SSR 16-3p, 2017 WL 5180304, *3 (S.S.A. revised and republished Oct. 25, 2017).[2]

At the first step, the ALJ must "determine whether the individual has a medically determinable impairment that could reasonably be expected to produce the individual's alleged symptoms." 2017 WL 5180304, at *3. The ALJ must base this determination upon objective medical evidence in the form of medical signs or laboratory findings. *Id*. Medical signs are "anatomical, physiological, or psychological abnormalities established by medically acceptable clinical diagnostic techniques that can be observed apart from an individual's symptoms." *Id*. The ALJ will not, however, consider whether the objective medical evidence supports the alleged severity of the individual's symptoms. *Id*.

At the second step, the ALJ must "evaluate the intensity and persistence of an individual's symptoms . . . and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities." 2017 WL 5180304, at *9.

---

[2] Although SSRs do not have the same force and effect as statutes or regulations, they are binding on all components of the Social Security Administration. 20 C.F.R. § 402.35(b)(1).

Among other things, the ALJ must decide whether the alleged symptoms and accompanying limitations are consistent with the evidence in the record. *Id.* at *8. The Social Security Administration "recognize[s] that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence." *Id*. The ALJ must therefore examine "the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id*. at *9. Further, when determining whether an individual's statements are consistent with her symptoms, the ALJ will keep in mind that the individual's statements may themselves be inconsistent because "[s]ymptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time." *Id*. at *8-9.

When evaluating the intensity, persistence and limiting effects of the claimant's alleged symptoms, the ALJ must consider the following factors:

1.   Daily activities;

2.   The location, duration, frequency, and intensity of pain or other symptoms;

3.   Factors that precipitate and aggravate the symptoms;

4.   The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5.   Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;

6.   Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7.   Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

2017 WL 5180304, at *7-8. The ALJ need only discuss those factors that are pertinent based upon the evidence in the record. *Id*. However, the ALJ's discussion of the applicable factors "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.* at *10; *see also Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) (if an ALJ discounts or rejects a claimant's subjective complaints, "he must clearly state his reasons for doing so").

The ALJ will also consider whether the individual sought medical treatment and followed the treatment that was prescribed. 2017 WL 5180304, at *9. Attempts to obtain treatment may show that symptoms are intense and persistent; conversely, a lack of such efforts may show that an individual's symptoms are not intense or persistent. *Id*. Similarly, "if the individual fails to follow prescribed treatment that might improve symptoms, [the ALJ] may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record." *Id*.

However, the ALJ "will not find an individual's symptoms inconsistent . . . on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints." 2017 WL 5180304, at

19

*9. The SSR explains, for example, that individuals may not seek or follow treatment due to side effects from medications, an inability to afford treatment, or an inability to understand the need for treatment due to a mental impairment. *Id*. at *9-10. The ALJ may need to contact the claimant—or to question the claimant at the administrative hearing—to ascertain the reason(s) for the lack of treatment. *Id*. at *9. The ALJ "*will* explain how [he or she] considered the individual's reasons" in the evaluation of the individual's symptoms. *Id.* at *10 (emphasis added); *cf. Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 (6th Cir. 2016) (the ALJ must consider the reasons for not obtaining treatment "before drawing an adverse inference from the claimant's lack of medical treatment.").

### 2.    The ALJ erred when evaluating Plaintiff's symptoms

The ALJ declined to evaluate Plaintiff's cognitive symptoms solely because there was no objective medical evidence of Alzheimer's disease or dementia. (Decision, Doc. No. 6-2 at PageID 42.) But the absence of a *mental* medically determinable impairment such as dementia or Alzheimer's disease does not justify summarily dismissing cognitive complaints when there are *physical* medically determinable impairments that could "reasonably be expected to produce" the same symptoms. *See* 20 C.F.R. § 404.1521; SSR 16-3p, 2017 WL 5180304, at *3.

Here, the ALJ found that "the evidence of record does not identify *any* etiology for [Plaintiff's] subjective reports of memory loss." (Decision, Doc. No. 6-2 at PageID 42 (emphasis added).) This statement is belied by Dr. Salim's opinion (which the ALJ cited) that the etiology of Plaintiff's mild cognitive deficits was "likely multifactorial" and that "[p]otential contributing factors include worry and recent stressors, chronic pain, and

20

poor sleep." (AR, Doc. No. 6-7 at PageID 343, 356; see also Decision, Doc. No. 6-2 at PageID 42). It is further belied by the ALJ's determination that Plaintiff had severe, medically determinable impairments of osteoarthritis, lumbar spine degenerative disc disease, tendinosis/tendinitis, and insomnia. (Decision, Doc. No. 6-2 at PageID 41.) Because these impairments and their symptoms (such as pain) could reasonably be expected to produce Plaintiff's cognitive symptoms, the ALJ was required to evaluate those symptoms under SSR 16-3p. Since the ALJ did not do so, reversal is required.

The ALJ further erred when analyzing Plaintiff's pain complaints. The ALJ explained that Plaintiff's pain was extreme (10/10); Plaintiff did not want to stop taking a high (and indeed unsafe) dosage of opioids; physical examinations were "largely unremarkable, with only moderate findings"; Plaintiff did not require an assistive device, such as a cane, to ambulate; and Plaintiff "remained able to drive, seek out treatment and meaningfully participate in her own care." (Decision, Doc. No. 6-2 at PageID 46.) Although the ALJ did not explicitly dismiss Plaintiff's pain complaints, she also did not explain whether, and to what extent, she accounted for them in the RFC. Absent such an explanation, it is reasonable to conclude that the ALJ completely discounted Plaintiff's pain complaints because she did not find them to be credible.

However, SSR 16-3p does not permit ALJs to assess a claimant's credibility when evaluating their symptoms. Instead, ALJs shall "consider all of the evidence … when they evaluate the intensity and persistence of symptoms" and "determine how symptoms limit ability to perform work-related activities." SSR 16-3p, 2017 WL 5180304, at *1. The ALJ's explanation does not comply with this requirement. The ALJ did not explain,

21

for example, whether she considered Plaintiff's testimony that she alternates standing and sitting positions to alleviate pain. Nor did the ALJ explain why she did not include postural limitations in the RFC.

The ALJ similarly erred by failing to adequately explain why she discounted Plaintiff's complaints about her gastrointestinal condition. The ALJ described Plaintiff's treatment history for this condition in her summary of the medical evidence. (Decision, Doc. No. 6-2 at PageID 44-45.) The ALJ acknowledged that Plaintiff was hospitalized for several days in July 2022 for gastritis and grade 3 reflux esophagitis. (*Id.* at PageID 44 (citing AR, Doc. No. 6-7 at PageID 451).) The ALJ also acknowledged that Plaintiff underwent a truncal vagotomy with gastrojejunostomy in September 2022. (*Id.* at PageID 45 (citing AR, Doc. No. 6-7 at PageID 446).) The ALJ then summarized an October 2022 post-operative follow-up visit and stated that the report showed that Plaintiff was "tolerating a diet without difficulty, with normally functioning bowels, and plans to follow up in 6-12 months to evaluate her gastrojejunostomy (Exhibit 7F, page 97)." (*Id.* (citing AR, Doc. No. 6-7 at PageID 585).)

But in her evaluation of Plaintiff's subjective complaints, the ALJ merely acknowledged Plaintiff's treatment history and stated: "The record also shows a history of gastroesophageal reflux disease and irritable bowel syndrome for which [Plaintiff] was treated both with chronic medications as well as a gastrointestinal surgical intervention." (Decision, Doc. No. 6-2 at PageID 46.) The ALJ did not cite any evidence or provide any reasoning to discount Plaintiff's subjective complaints about this condition. Indeed, the ALJ did not even acknowledge Plaintiff's testimony that she continued to experience

22

issues with nausea and vomiting (AR, Doc. No. 6-2 at PageID 70-71), much less explain whether or how the RFC accommodates Plaintiff's gastrointestinal impairments. (Decision, Doc. No. 6-2 at PageID 46-47.) The ALJ therefore also failed to evaluate Plaintiff's gastrointestinal complaints pursuant to SSR 16-3p.

Defendant argues that the ALJ's decision is supported by substantial evidence and "[t]he Court should decline Plaintiff's invitation to reweigh the evidence." (Mem. In Opp., Doc. No. 10 at PageID 914 (citing *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).) This assertion misses the mark. The law does "presuppose[] that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Mullen*, 800 F.2d at 545; *see also White*, 572 F.3d at 282. And the ALJ's decision "need not be so comprehensive as to account with meticulous specificity for each finding and limitation, nor is the ALJ required to discuss every piece of evidence in the record." *Correa v. Comm'r of Soc. Sec.*, No. 1:23-cv-685, 2023 U.S. Dist. LEXIS 231766, at *31 (N.D. Ohio Dec. 14, 2023) (citing *Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012); *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004)).

Nevertheless, the ALJ must "build an accurate and logical bridge between the evidence and his conclusion." *Amber S.*, 2023 U.S. Dist. LEXIS 171553, at *12. *See also Julie P. v. Comm'r of Soc. Sec.*, No. 2:21-cv-4170, 2022 U.S. Dist. LEXIS 116490, at *13 (S.D. Ohio June 30, 2022) (Jolson, M.J.) (citation omitted), *report and recommendation adopted*, No. 2:21-cv-4170, 2022 U.S. Dist. LEXIS 138572 (S.D. Ohio Aug. 3, 2022) (Morrison, D.J.), *aff'd*, *Pettit v. Comm'r of Soc. Sec.*, No. 22-3826, 2023 U.S. App. LEXIS 10964 (6th Cir. 2023); *Alevras v. Colvin,* No. 13 C 8409, 2015 U.S.

23

Dist. LEXIS 59394, *12 (N.D. Ill. May 6, 2015) ("merely summarizing medical evidence is not the same as analyzing it and explaining how the evidence supports the conclusion that the claimant is not disabled") (citation omitted). Here, the ALJ's failure to build a logical bridge between the cited evidence and her conclusions prevents the Court from engaging in meaningful judicial review, which necessitates a remand. *See Blakley*, 581 F.3d at 409 (citing *Wilson v. Comm'r of Soc. Sec,* 378 F.3d 541, 544 (6th Cir. 2004)).

### C.     The ALJ's Errors Are Not Harmless.

The ALJ's errors can only be excused as harmless if they do not prejudice the claimant on the merits or deprive her of substantial rights. *Rabbers*, 582 F.3d at 654. The Court finds that the ALJ's errors were not harmless because they prejudiced Plaintiff on the merits. Therefore, reversal is required.

## V.     REMAND

Under Sentence Four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under Sentence Four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky*, 35 F.3d at 1041. The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.,* 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is neither overwhelming nor strong while contrary evidence is

24

lacking. *Faucher*, 17 F.3d at 176. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of Section 405(g) for the reasons stated above. On remand, the ALJ should further develop the record as necessary, particularly as to Plaintiff's subjective complaints, and evaluate the evidence of record under the applicable legal criteria mandated by the Commissioner's regulations and rulings and governing case law. The ALJ should evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether her application for Disability Insurance Benefits should be granted.

**IT IS THEREFORE ORDERED THAT**:

1.      Plaintiff's Statement of Errors (Doc. No. 8) is GRANTED;

2.      The Court REVERSES the Commissioner's non-disability determination;

3.      No finding is made as to whether Plaintiff was under a "disability" within the meaning of the Social Security Act;

4.      This matter is REMANDED to the Social Security Administration under Sentence Four of 42 U.S.C. § 405(g) for further consideration consistent with this Decision and Order; and

5.      This case is terminated on the Court's docket.

*s/ Caroline H. Gentry*
Caroline H. Gentry
United States Magistrate Judge

25
